UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARY J. PARKER,                    :
                                   :
           Plaintiff               :    CIVIL NO. 4:11-CV-00140
                                   :
    vs.                            :    (Judge Conaboy)
                                   :
MICHAEL J. ASTRUE,                 :
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
           Defendant               :

FILED
SCRANTON

MAR 2 6 2012

PER_____
DEPUTY CLERK

**MEMORANDUM**

**BACKGROUND**

The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Mary J. Parker's claim for supplemental security
income benefits.

Supplemental security income (SSI) is a federal income
supplement program funded by general tax revenues (not social
security taxes).  It is designed to help aged, blind or other
disabled individuals who have little or no income.

Parker, who was born on October 31, 1975, is a United
States citizen, and at all times relevant to this matter was
considered a "younger individual"[1] whose age would not seriously

---

1.  The Social Security regulations state that "[t]he term
younger individual is used to denote an individual 18 through
49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

impact her ability to adjust to other work. 20 C.F.R. §
416.963(c). Tr. 25, 49 and 284.[2]

Although Parker withdrew from school after completing
the eighth grade, she can read, write, speak and understand the
English language and perform basic mathematical functions. Tr. 58,
68 and 285-286.  During her elementary and secondary schooling
Parker attended regular education classes. Tr. 63.  Parker has a
driver's license. Id.

Records of the Social Security Administration reveal
that Parker has an extremely limited work and earnings history.
Tr. 47. Parker only worked during two years, 1997 and 1998, and
her total earnings were $2322.85. Id.  A vocational expert
testified that Parker has no past relevant employment. Tr. 482.

Parker claims that she became disabled on September 1,
1998,[3] because of "neck and back problems." Tr. 49, 58 and 69.
Parker alleges she has "severe neck and back pain"; she has
difficulty sitting and standing for extended periods; she has pain
which radiates to her lower extremities; she has difficulty
sleeping; her feet swell; and she has right knee pain,  Tr. 76,
78-79, 82 and 84.  Parker also contends she is disabled because of
migraine headaches, fibromyalgia, obesity and depression. Doc.

---

2.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant as part of his Answer on March 24,
2011.

3.  Parker was 22 years of age on the alleged disability onset
date and is presently 36 years of age.

10, Plaintiff's Brief, p. 1; Tr. 296-297.  As for the frequency of the migraine headaches, Parker claims she has them everyday. Tr. 78 and 296.  The impetus for Parker's claimed disability is an automobile accident – an event which reportedly occurred in April 1999.[4] Tr. 104.

On October 5, 2006, Parker protectively filed[5] an application for supplemental security income benefits. Tr. 18 and 65.  The alleged disability onset date of September 1, 1998, has no impact on Parker's application for supplemental security income benefits for two reasons. First, supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met." See C.F.R. § 416.501.  Consequently, Parker is not eligible for SSI benefits for any period prior to November 1, 2006.  Second, on July 11, 2006, Parker received, and took no appeal from, a prior administrative denial of an application for supplemental security

---

4.  There are conflicting dates in the record regarding when the accident occurred. In 2007 Parker appears to have told an examining physician that the accident occurred in 2000. Tr. 185. Also, Parker claims that she became disabled in September, 1998, yet the motor vehicle accident did not occur until 1999 or 2000.

5.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

income benefits by a different administrative law judge.   Tr. 18.
Consequently, the date for reviewing the medical evidence in this
case commences on July 12, 2006, because re-litigation of Parker's
medical condition prior to that date is precluded by *res judicata*.
See <u>Rogerson v. Secretary of Health and Human Services</u>, 872 F.2d
24, 29 (3d Cir. 1989)(recognizing the doctrine of *res judicata* in
social security cases).   The date of July 12, 2006, is referred to
as the established disability onset date.   Tr. 20.

         With respect to Parker's present application for
supplemental security income benefits, after that application was
denied initially, a hearing was held on January 23, 2008, before
an administrative law judge.   Tr. 280-303.   On March 17, 2008, the
administrative law judge issued a decision denying Parker's
application for benefits. Tr. 18-26.   Parker on April 8, 2008,
filed a request for review of the decision with the Appeals
Council of the Social Security Administration. Tr. 13.   On June
27, 2008, the Appeals Council concluded that there was no basis
upon which to grant Parker's request for review.   Thus, the
administrative law judge's decision stood as the final decision of
the Commissioner.

         Parker then filed a complaint in this court to Civil No.
4:08-CV-1365.   On March 18, 2008, this court remanded the case to
the Commissioner for further proceedings primarily because the
administrative law judge stated that "there is no diagnosis of

4

[fibromyalgia] by either her primary care physician or any other medical professional in the record." Tr. 21; <u>Parker v. Astrue</u>, Civil No. 08-CV-1365 (M.D.Pa. filed July 18, 2008)(Doc. 12)(Muir, J.).  In fact, however, Raphael Kon, M.D., a medical consultant for the Social Security Administration who examined Parker found "multiple tender points over [Parker's] cervical, thoracic and lumbar spine corresponding to tender points" and concluded that Parker suffered from fibromyalgia.  Tr. 187.

After the case was remanded, the Appeals Council issued an order vacating the decision of the Commissioner and remanding the case to the same administrative law judge for further proceedings. Tr. 342.  The administrative law judge held a second hearing on February 17, 2010, and on March 22, 2010, issued a decision denying Parker's application for supplemental security income benefits. Tr. 318-329.  On April 22, 2010, Parker requested that the Appeals Council review the administrative law judge's decision. Tr. 310-314.  After 7 months had passed, the Appeals Council on November 22, 2010, concluded that there was no basis upon which to grant Parker's request for review. Tr. 304-305 Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Parker then filed a complaint in this court on January 20, 2011.  Supporting and opposing briefs were submitted and the

appeal[6] became ripe for disposition on July 25, 2011, when Parker
elected not to file a reply brief.

For the reasons set forth below we will affirm the
decision of the Commissioner denying Parker's application for
supplemental security income benefits.

**STANDARD OF REVIEW**

When considering a social security appeal, we have
plenary review of all legal issues decided by the Commissioner.
See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d
Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181
F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d
857, 858 (3d Cir. 1995). However, our review of the
Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is
to determine whether those findings are supported by "substantial
evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.
1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); Cotter

---

6.   Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."   M.D.Pa. Local Rule 83.40.1.

v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts

7

from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment or
> impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work. For

8

> purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating supplemental security income claims. See 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[7] (2) has an impairment that is severe or a combination of impairments that is severe,[8]

---

7. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

8. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 416.945(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. §
(continued...)

(3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[9] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[10]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

8.   (...continued)
416.945(c).

9.   If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

10.   If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Parker's medical records.

We will start by reviewing a few pertinent records that predate Parker's established disability onset date of July 12, 2006. On August 4, 2004, Parker had x-rays of the cervical spine performed. Tr. 184. The alleged reason for having those x-rays was noted to be as follows: "Stiff neck with left-hand numbness following chiropractic adjustment." Id. The x-rays revealed that

> [t]he cervical vertebrae show normal alignment. The vertebral bodies are preserved in height and normal configuration. There is some slight straightening of the usual cervical curvature which could represent some muscular spasm. The prevertebral soft tissues are normal. The neural foramen are patent throughout.

Id. The impression of Edwin R. Acosta, M.D., the radiologist, was that the "[s]light straightening suggests a muscular spasm otherwise [Parker had a] normal cervical spine." Id.

In 2005 and through July 3, 2006, John Maylock, M.D.,[11] Parker's primary care physician completed three "Pennsylvania Department of Public Welfare Employability Assessment Forms." Tr. 117-122. In these forms Dr. Maylock indicated in a conclusory fashion that Parker was temporarily incapacitated for less than 12 months because of back pain for intervals of time lasting between

---

11.  Dr. Maylock practiced out of the Guthrie Clinic in Towanda, Pennsylvania.

3 and 6 months. Id. These forms did not provide any details about Parker's physical functional abilities, i.e., her ability to sit, stand, walk, carry, lift, etc.

Despite Dr. Maylock's conclusory opinion on each of these checkbox welfare forms, Parker underwent only one diagnostic study of her lumbar spine in 2005. Tr. 245. That study, a CT scan, on June 8, 2005 revealed the following: "Axial images were obtained from L2 through the sacral level. There is an incidental spina bifida occulta defect at S1, not considered of clinical significance, and the lumbar vertebrae are otherwise unremarkable, there is no focal disc protrusion, the facet joints are intact, and there is no significant central can or neural foraminal stenosis. Multiplanar reconstructions show normal alignment, and there has been no significant change since the [the prior CT scan of] 09/14/00." Id. The impression of David Rayne, M.D., the radiologist, was that the study was "[n]ormal." Id.

During 2005 and 2006, Parker presented to Dr. Maylock office approximately twice a month. Tr. 125-181. The diagnostic impression at those visits was primarily obesity. Id. There were rarely any objective adverse musculoskeletal findings recorded by Dr. Maylock upon physical examination during those visits. Id. Although Dr. Maylock routinely filled Parker's requests for Darvocet and Soma for complaints of pain and Fastin for an attempt

12

at weight loss, Dr. Maylock when reviewing Parker's systems[12]
never recorded any adverse findings. Id.

On August 5, 2006, Parker visited the emergency
department of the Memorial Hospital in Towanda, Pennsylvania,
complaining of pain which resulted from "stubb[ing] [her] toe on a
coffee table[.]" Tr. 218.  Parker claimed she "broke [her] toe."
Id.  The record of this visit reveals that Parker was smoking 1.5
packs of cigarettes per day and consuming alcohol on an occasional
basis. Tr. 219.  A physical examination of Parker was performed by
the emergency department physician and X-rays of the right foot
were ordered. Tr. 220 and 217.  The physical examination revealed
that "[t]he right dorsal surface of the first toe [was] tender
swollen ecchymotic erythmatous warm to touch." Tr. 220. The
results of the x-rays were normal. Tr. 217.  Parker was prescribed
an antibiotic and narcotic pain medication, advised to follow-up
with her primary care physician and discharged from the hospital.
Tr. 222.

On September 27, 2006, based on a referral from Dr.
Maylock, Parker had an appointment with Burdett Porter, M.D., a
pain management specialist, at the Guthrie Clinic, Sayre,
Pennsylvania. Tr. 180-181.  A physical examination by Dr. Porter
revealed that Parker "ambulates without assistance." Tr. 180.

_____

12.  "The review of systems (or symptoms) is a list of questions,
arranged by organ system, designed to uncover dysfunction and
disease." A Practical Guide to Clinical Medicine, University of
California, School of Medicine, San Diego, http://meded.ucsd.edu/
clinicalmed/ros.htm (Last accessed January 20, 2012).

13

Parker had "good strength and good range of motion for ankle
dorsiflexion and plantarflexion, knee extension and flexion, hip
flexion bilaterally as well as good strength for elbow flexion and
extension, hand grip." Id.  Parker's neck "did not appear to have
any decreased range of motion." Tr. 181.  Examination of her
shoulders revealed that she could "abduct . . . up to 90
degrees"[13] but not "further because of pain in the neck and
shoulder region." Id.  Parker had "muscle tenseness through the
left trapezius without a specified trigger point" and "tenderness
over the left sacroiliac joint but no other palpable trigger
points." Dr. Porter's diagnostic impression was that Parker
suffered from left sacroiliac joint pain and myofascial (muscle)
pain of the left trapezius. Id.  Dr. Porter on November 17, 2006,
administered a combination of a long acting local anaesthetic
(bupivacaine) and an anti-inflammatory steroid medication (Depo-
Medrol) into her sacroiliac joint. Tr. 179.  After undergoing this
injection, Parker never returned to Dr. Porter.

        In 2007, Parker stopped visiting Dr. Maylock and
commenced visiting the Sweet Family Practice, located in Wysox,

---

13.  Abduction is moving a joint away from the body. With respect
to the shoulders, abduction is moving the arm from resting at the
side of the body in an arc to a position over the head. "Jumping
jacks is an example of abduction." Normal shoulder abduction is
170 to 180 degrees. What is Normal Range of Motion for the
Shoulder? Livestrong.com, http://www.livestrong.com/article
/87508-normal-range-motion-shoulder/ (Last accessed March 22,
2012).   This finding by Dr. Porter suggests that Parker had
difficulty with raising her arms above her head. As will be
mentioned infra, the administrative law judge accommodated this
limitation in his residual functional capacity determination.

Pennsylvania. Tr. 241.  At the Sweet Family Practice, Parker was
regularly examined by Cheryl Perry, a certified registered nurse
practitioner. Tr. 223-255.  On January 22, 2007, Ms. Perry noted
that Parker had good range of motion of the neck, her spine was
non-tender to palpation and her sensation was intact. Tr. 242.
Ms. Perry further noted that Parker could sit 1 ½ hours at a time
and she could stand indefinitely if she could lean against
something. Id.  Ms. Perry also on January 22ⁿᵈ completed a
Pennsylvania Department of Public Welfare form on behalf of Parker
in which she stated that Parker was temporarily incapacitated from
any form of employment from January 22 through April 20, 2007. Tr.
251.  Ms. Perry did note that Parker's condition was expected to
improve. Id.  Parker had a follow-up appointment with Ms. Perry on
February 13, 2007. Tr. 240.  Ms. Perry's notes of this appointment
reveal minimal objective findings. Id.  Ms. Perry indicated that
Parker suffered from (1) obesity and prescribed the drug Fastin
(phentermine hydrochloride) and (2) back pain and prescribed the
narcotic drug Darvocet. Id.

On March 28, 2007, Parker was examined by Dr. Kon on
behalf of the Bureau of Disability Determination. Tr. 185-190.
Upon review of Parker's systems, Parker denied ataxia (lack of
coordination of muscles), numbness or tingling sensation. Tr. 186.
Parker did complain of multiple tender points in her neck, back
and shoulders. Id.  A physical examination revealed that Parker
had no difficulty getting on and off the examination table; there

15

were no adverse findings with respect to her neck, lungs, heart,
and abdomen (other than obesity and a surgical scar). Tr. 186-187.
Dr. Kon examination of Parker's shoulders "revealed good range of
motion with internal and external circumferential motion." Tr.
187.  Parker's elbows also had "good range of motion." Id.  Dr.
Kon did find "multiple tender points over her cervical, thoracic
and lumbar spine corresponding to [fibromyalgia] tender points."
Id.  Dr. Kon's impression was that Parker suffered from (1)
fibromyalgia with no evidence of peripheral neuropathy, (2)
depression, and (3) a history of tobacco abuse. Id.  Dr. Kon also
completed a statement of Parker's ability to perform work-related
physical activities. Tr. 189-190.  Dr. Kon found that Parker had
no limitations, including no limitations with respect to lifting,
carrying, standing, walking, sitting, pushing and pulling. Id.  In
a follow-up letter dated April 11, 2007, Dr. Kon also noted that
Parker's station and gait was normal; that she did not use an
assistive device to walk; and her mood, behavior, memory,
orientation, concentration, hygiene, and ability to communicate,
relate to office staff and follow directions were all normal. Tr.
191.

     Parker had a regularly scheduled appointment with Ms.
Perry on April 17, 2007. Tr. 237.  Ms. Perry's notes of this
appointment reveal minimal objective findings. Id.  Parker told
Ms. Perry that her dieting was "not going well" and that she
thought it would "be better when good weather comes" and "she can

16

get out [and] walk." Id.  Ms Perry indicated that Parker suffered from obesity and refilled Parker's prescription for Fastin

On May 1, 2007, Sidney D. Segal, Ed.D., a psychologist, reviewed Parker's medical records on behalf of the Bureau of Disability Determination, and concluded that Parker's mental impairments were not severe. Tr. 192.  There are only two treatment notes from Northern Tier Counseling in the record and no further documentation regarding formal mental health treatment. Tr. 388-391.

An MRI of Parker's lumbosacral spine on May 16, 2007, revealed the following: "[M]inimal evidence of disc desiccation, degeneration at L1-2 and L5-S1. There is no notable bulge or herniation at either of these two disc levels. The remaining discs are normal. The vertebrae are intact and normal in alignment. There is an incidental lipoma in L4 body. The dimensions of the spinal canal and neural foramina are satisfactory. No facet pathology is evident. The conus medullaris is normal.  No intradural abnormality is shown. A limited coverage of the retroperitoneum is normal." Tr. 246.

An MRI of Parker's cervical spine on May 17, 2007, revealed "a moderate left posterolateral disc herniation at C5-C6" which was "producing moderate encroachment on the intervertebral foramina at C5-6 on the left." Tr. 247.  However, a follow-up MRI in July, 2009, only revealed at the C5-C6 level "a small left paracentral disc protrusion which impresses upon the anterior

aspect of the thecal sac to the left of the midline" which was
"caus[ing] mild to moderate left neural foraminal narrowing." Tr.
395. Also, an MRI of the lumbar spine in July, 2009, was
unremarkable and revealed "no evidence of spinal canal stenosis or
neural foraminal narrowing[.]" Tr. 397.

   After the MRIs of May 16 and 17, 2007, Parker paid a
visit to the emergency department at Memorial Hospital in Towanda
complaining of numbness in left arm, lip and left leg. TR. 209-
215.  The record reveals that Parker drove to the hospital by
herself. Id.  Parker denied headaches, speech difficulty,
dizziness or extremity weakness. Tr. 210. She indicated she was
smoking 1.5 packs of cigarettes per day and occasionally consuming
beer. Id.  A physical examination of Parker was essentially
normal, including normal range of motion in all four extremities
and a normal gait. Tr. 211-212.  Several diagnostic tests were
ordered, including a complete blood count and chemistry and an
EKG. Tr. 212-213. It was noted that Parker appeared to be in good
general health. Tr. 214. Parker was discharged from the hospital
the same day and advised to follow-up with her primary care
physician. Tr. 215.

   Parker had regularly scheduled appointments with Ms.
Perry on July 5, October 2, and December 27, 2007. Tr. 232-234.
The notes of the July 5th appointment only reveal normal findings.
Tr. 234.  Ms. Perry stated that Parker "sits upright" and "holds
head upright." Id.  Ms. Perry's assessment was that Parker

18

suffered from neck and back pain which was manageable with Darvocet. Id.  The notes of the October 2, 2007, appointment reveal normal physical examination findings, including that Parker had normal range of motion of the extremities. Tr. 233.  It was further noted that Parker failed on two occasions to show for scheduled appointments for a fibromyalgia evaluation by a physician to which she was referred.  Id.  At the appointment on December 27th there are no physical examination findings noted. Tr. 232.  Ms. Perry did note that Parker was "sitting slouched in her chair, head tipped towards the (L) shoulder" and that Parker "started crying after [Ms. Perry] entered the room."  Id.  It was again noted that Parker did not keep the scheduled fibromyalgia appointments.  Id.  Also, the chief reason given for this appointment was "paperwork to be completed for atty."  Id.

        From our review of the record, Parker during the year 2008 had 10 appointments at the Sweet Family Practice either seeing Ms. Perry or Constance Sweet, M.D. Tr. 276, 278-279, 401-406 and 441.  The appointments were on January 25, March 10, April 14, May 19, June 16, July 8, August 5, October 9, November 10, and December 29. Id.  In addition to being treated for obesity and neck and back pain, Parker was treated on occasion for gastrointestinal problems, bronchitis and depression.  Id. However, adverse physical examination findings in the notes of these appointments are almost non-existent.  Id.   On March 10th rhonchi (coarse rattling sounds) were noted upon examination of

Parker's lungs and Parker was diagnosed with bronchitis and prescribed Cipro, an antibiotic. Tr. 278.  On May 19th it was noted that Parker had decreased flexion and rotation of the cervical spine. Tr. 401.  Finally, on December 29th it appears that Parker had sacroiliac joint tenderness and decreased range of motion of the bilateral lower extremities. Tr. 406.

Also, in 2008, Parker visited the emergency department of the Memorial Hospital in Towanda on two occasions. Tr. 258-275. First, on March 7th she arrived at the emergency department ambulatory accompanied by a family member. Tr. 258.  Her chief complaint was low back pain which was non-radiating.[14] Tr. 259. Parker denied leg weakness and leg numbness. Id.  She denied fatigue, dizziness, head pain, neck pain, shoulder pain, extremity pain, hip pain, joint swelling, and arthralgia (joint pain). Tr. 260. It was noted that she was smoking 1.5 pack of cigarettes per day and occasionally consuming beer. Tr. 259-260.  The results of a physical examination were essentially normal, including normal muscle strength, sensation, deep tendon reflexes and gait. Tr. 261. Parker was given several pain medications, including the ant-inflammatory drug Toradol, and discharged from the hospital the same day with instructions to follow-up with her primary care physician. Tr. 262-263. Two days later on March 9th Parker again visited the emergency department at the Memorial Hospital

--------------------------------------------------

14.  As noted earlier, radiographs of her lumbosacral spine revealed no significant abnormalities.

complaining of vomiting and a cough in addition to low back pain. Tr. 270. Several diagnostic tests were ordered, including a chest x-ray. Id.  Parker was diagnosed as suffering from bronchitis and low back pain and discharged from the hospital the same day with instruction to follow-up with her primary care physician. Tr. 275.

In 2009, Parker had one visit to the emergency department at the Memorial Hospital and three appointments at Sweet Family Practice and then she discontinued her care at Sweet Family Practice and recommenced receiving primary care from Dr. Maylock. Tr. 407-409, 413 and 467.

On February 9, 2009, Parker visited the emergency department at the Memorial Hospital complaining of heaviness in the chest, cough and congestion. Tr. 413.  It was noted that Parker was smoking 1.5 packs of cigarettes per day and occasionally consuming beer. Tr. 415.  The diagnosis was acute bronchitis. Tr. 413. Parker was discharged from the hospital the same day with instruction to follow-up with her primary care physician. Tr. 422. Parker had appointments with Sweet Family Practice on February 2, April 29 and July 22, 2009. Tr. 407-409. The notes of these appointment do not reveal any adverse physical examination findings other than on July 22nd when it was noted that Parker had decreased back and cervical range of motion and the cervical area was tender to palpation. Tr. 409.

On November 25, 2009, Parker had an appointment with Dr. Maylock. Tr. 467.  The notes of this appointment state that Parker

"presents for follow up" and "was last seen in this office 2 year
ago. She has been seeing Dr. Sweet.  She had a problem at that
office. . . She is not doing any [physical therapy]. She has not
been see in pain clinic in a long time. In the last 4 months she
has developed and intention tremor[15] of the right side." Id.  Dr.
Maylock noted an "equivocal straight leg raise" test, refilled her
pain medications and referred her to the pain clinic. Id.  On
December 23, 2009, and January 8 and 29, 2010, Parker had follow-
up appointments with Dr. Maylock. Tr. 468.  The notes of these
appointments are unrevealing as to Parker's functional ability.
Id.

       The last medical record we will mention relates to
Parker's visit to the emergency department at the Memorial
Hospital on January 7, 2010. Tr. 430-434.  On that date Parker
drove herself to the emergency department. Id.  Her chief
complaint was as follows: "I don't know what I did to my back, but
it hurts." Id.  A physical examination was essentially normal. Tr.
432. It was stated that Parker's back appeared normal and was non-
tender to palpation; and her range of motion in the back was
normal, reflexes were normal, motor strength was normal, sensation
was intact, and gait was normal. Id.  Parker was discharged from
the hospital on the same day. Tr. 433.

---

15.  An intention tremor is an involuntary trembling of the body
or limb having either a physical or psychological cause.

22

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Parker had not engaged in substantial gainful work activity October 5, 2006, the application date. Tr. 320.

At step two of the sequential evaluation process, the administrative law judge found that Parker had the following severe impairments: "degenerative disc disease of the cervical spine; fibromyalgia; and depressive disorder." Id.  The administrative law judge found that Parker did not have a medically determinable or severe impairment of the low back; her obesity was not a severe impairment; she did not have a medically determinable impairment of the shoulders; her alleged migraines were not a medically determinable impairment; and Parker did not have a medically determinable impairment of panic attack or anxiety. Tr. 321.

At step three of the sequential evaluation process the administrative law judge found that Parker's impairments did not individually or in combination meet or equal a listed impairment. Tr. 322-324.

At step four of the sequential evaluation process the administrative law judge found that Parkers had no past relevant work and had "the residual functional capacity to perform a full range of work at all exertional level but with the following nonexertional limitations: the claimant should never be on

23

ladders, she has a bilateral overhead reaching limitation; the claimant should avoid temperature extremes, humidity, vibration and hazards; she is limited to simple, routine tasks and jobs that are low stress, involving only occasional decision-making and only occasional changes in the work setting." Tr. 324.  In setting this residual functional capacity, the administrative law judge relied on the opinions of Dr. Kon who found that Parker had no physical exertional limitations and Dr. Segal who found that Parker did not have any severe mental impairments. Tr.322 and 326.  The administrative law judge also rejected the conclusory forms from Dr. Maylock and Ms. Perry which indicated that Parker was temporarily disabled during several periods of time. Tr. 327.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge at step five of the sequential evaluation process found that Parker could perform work as a production helper, a packager and a cashier, and that there were a significant number of such jobs in the local and state economies. Tr. 323.  The vocational expert also identified filler, inspector, and cafeteria attendant positions that Parker could perform at the light exertional level of work. Tr. 484.:

The administrative record in this case is 486 pages in length, primarily consisting of medical and vocational records. Parker makes the following arguments: (1) the administrative law judge failed to perform her affirmative obligation to assist

24

Parker in developing the record and exhibited bias against Parker
and (2) the administrative law judge erred by failing to give
significance to the opinions of treating medical providers.

We have thoroughly reviewed the record in this case and
find no merit in Parker's arguments. The administrative law judge
did an excellent job of reviewing Parker's vocational history and
medical records in her decision. Tr. 318-329.  Furthermore, the
brief submitted by the Commissioner thoroughly reviews the medical
and vocational evidence in this case. Doc. 11, Brief of Defendant.

Initially we will note that no treating physician has
provided a functional assessment of Parker's physical and mental
abilities.  Under those circumstances, it was clearly appropriate
for the administrative law judge to rely on the physical
functional assessment of Dr. Kon and the mental functional
assessment of Dr. Segal. See Chandler v. Commissioner of Soc.
Sec., __F.3d.__, 2011 WL 6062067 at *4 (3d Cir. Dec. 7.
2011)("Having found that the [state agency physician's] report was
properly considered by the ALJ, we readily conclude that the ALJ's
decision was supported by substantial evidence[.]").  The forms
specifying period of temporary disability completed by Dr. Maylock
and Ms. Perry failed to give sufficient supporting evidence for
their respective opinions or provide specific work-related
limitations precluding Parker from performing basic work
activities.

        We are satisfied that the administrative law judge
appropriately took into account all of Parker's mental and
physical limitations in the residual functional capacity
assessment.

        The administrative law judge stated that Parker's
statements concerning the intensity, persistence and limiting
effects of her symptoms were not credible to the extent that they
were inconsistent with the ability to perform work consistent with
the residual functional capacity described above. The
administrative law judge was not required to accept Parker's
claims regarding her physical and mental limitations. See Van Horn
v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that
credibility determinations as to a claimant's testimony regarding
the claimant's limitations are for the administrative law judge to
make).  It is well-established that "an [administrative law
judge's] findings based on the credibility of the applicant are to
be accorded great weight and deference, particularly since [the
administrative law judge] is charged with the duty of observing a
witness's demeanor . . . ."  Walters v. Commissioner of Social
Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v.
Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.
1991)("We defer to the ALJ as trier of fact, the individual
optimally positioned to observe and assess the witness
credibility.").  Because the administrative law judge heard and

observed Parker  testify on two occasions, the administrative law
judge is the one best suited to assess the credibility of Parker.

      We will note that with regard to the credibility
determination there are several reasons to doubt Parker's
credibility, including the fact that Parker testified at the
administrative hearing that she had headaches everyday.  However,
our review of the medical records did not reveal complaints of
frequent headaches.

      Finally, we are unable to discern any bias on the part
of the administrative law judge or failure of the administrative
law judge to appropriately develop the record.  At the conclusion
of the administrative hearing on February 17, 2010, the
administrative law judge kept the record open for 7 days to give
Parker time to submit additional evidence. On February 22, 2010,
Parker submitted several treatment records from Dr. Maylock which
we reviewed above.  Parker has not indicated what additional
evidence would be relevant.

      Our review of the administrative record reveals that the
decision of the Commissioner is supported by substantial evidence.
We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the
decision of the Commissioner.

      An appropriate order will be entered.

_____
RICHARD P. CONABOY
United States District Judge

Dated: March 7/6, 2012

27